**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JACQUELYN S. PARTLOW,

        **Plaintiff,**

  v.                                     Civil Action 2:18-cv-1702
                                          Judge Edmund A. Sargus
                                          Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Jacquelyn Partlow, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge under Sentence Four of § 405(g).

**I.    BACKGROUND**

Plaintiff filed her application for DIB and SSI on April 18, 2007, alleging that she was disabled beginning August 10, 2006. (Tr. 137–47). After her applications were denied initially and on reconsideration, Administrative Law Judge ("ALJ") Earl Crump held a hearing on November 10, 2009, and denied Plaintiff's claim in a written decision on November 25, 2009. (Tr. 656–63). Plaintiff appealed, and this Court vacated and remanded the case for a new hearing. (Tr. 674–94). ALJ Patricia Yonushonis held a new hearing and denied Plaintiff's claim for benefits on May 9, 2014. (Tr. 702–17). Plaintiff appealed, and the Appeals Council vacated the ALJ's decision and remanded the claim for a new hearing. (Tr. 725–30). ALJ Thomas Wang held a new

1

hearing and issued a new decision denying benefits on May 27, 2016. (Tr. 1092–15). This Court remanded that decision for a new hearing. (Tr. 1116–19). After a July 20, 2018 hearing, ALJ Wang again denied Plaintiff's claim, (Tr. 1029–68), and Plaintiff appealed directly to this Court.

In his decision, ALJ Wang found that Plaintiff met the insured status requirement through September 30, 2008. (Tr. 1035). Plaintiff returned to work in 2016, and therefore, the relevant closed period in this matter is April 18, 2007 (the date she filed her claim) and May 27, 2016 (the date of the ALJ's decision).

ALJ Wang determined that Plaintiff has the following severe impairments: cervical, thoracic, lumbar, and degenerative disc disease, radiculopathy, fibromyalgia, and vertebrobasilar insufficiency. (Tr. 1036). He found, however, that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 1039). The ALJ made the following residual functional capacity ("RFC") finding:

> [T]he claimant has the residual and functional capacity to perform sedentary work . . . except occasional operation of foot controls; push and/or pull limited as per sedentary exertional level; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; never climb ladders, ropes, or scaffolds; no commercial driving; occasional overhead reaching; frequently handle and finger; must be allowed to rest during breaks; occasional exposure to extreme cold and extreme heat; stand and/or walk one hour at a time; sit two hours at a time; no exposure to hazardous machinery or unprotected heights.

(*Id.*).

**A. Relevant Medical Background**

In April 2007, Plaintiff's chiropractor noted that Plaintiff's neck and shoulder pain, as well as range of motion had improved. (Tr. 332). He found that her low back was still an issue, indicating that she had high pain, spasms, and trigger points. (*Id.*). In June 20007, Plaintiff's chiropractor noted extensive trigger points. (Tr. 273). In August 2007, Plaintiff reported neck and

2

back pain and trouble sleeping. (Tr. 282). In September 2007, she was diagnosed with fibromyalgia. (Tr. 280). She noted that while her medications caused grogginess, they helped somewhat to relieve her pain. (*Id.*). November 2007 records document continued reports of pain and medication side effects. (Tr. 444). In December 2007, Plaintiff noted that her pain could be all over and, as a result, was prescribed new medication. (Tr. 443).

In February 2008, Plaintiff complained of bilateral wrist pain. (Tr. 356). In April 2008, she reported pain following a workplace injury. (Tr. 414). At a May 2008 appointment, Plaintiff reported pain in her left leg but also noted that she was having more good days. (Tr. 413). In June 2008, Plaintiff indicated that increased medications had helped with her symptoms but that she was still having occasional flares. (Tr. 440). In August 2008, Plaintiff described numbness and tingling in her feet that radiated up to her knees. (Tr. 438). At a September 2008 appointment, she reported left foot paresthesia, low back pain, and numbness in her feet. (Tr. 437). October 2008 records document Plaintiff's fibromyalgia as "stable." (Tr. 436). In November 2008, Plaintiff stated that every inch of her body hurt, but acknowledged that her pain had increased since she recently stopped taking her medications. (Tr. 435). At an appointment the next month, she explained that she had stopped taking her medications because of side effects, including panic attacks and suicidal thoughts. (Tr. 434). She then switched to a new medication. (*Id.*).

In February 2009, Plaintiff reported that she was pleased with her current fibromyalgia medication regimen. (Tr. 432). In April 2009, she was in a car accident and sustained minor injuries. (Tr. 425–28). In October 2009, Plaintiff complained of continued fatigue, headaches, and pain in her neck, low back, and muscles. (Tr. 928).

At a follow-up appointment for fibromyalgia in February 2010, Plaintiff described neck and back pain and feeling tired all the time. (Tr. 887). In July 2010, Plaintiff complained again

of neck and back pain and fatigue. (Tr. 886). On exam, she had 18 of 18 positive tender points. (*Id.*).

In March 2011, Plaintiff noted that her fibromyalgia medication made her nauseous but helped slightly with her pain. (Tr. 884). In May 2011, she reported she was not functional for several days due to her fibromyalgia. (Tr. 883). In June 2011, she reported good results with her fibromyalgia medication. (Tr. 882). In August 2011, Plaintiff complained of pain from her fibromyalgia but noted that her medication helped with the pain. (Tr. 881).

Treatment records from February 2012 document neck, back, and knee pain, as well as "more significant [fibromyalgia syndrome] symptom[s]." (Tr. 878). In August 2012, she reported that her current medications helped with her neck and back pain but were still "suboptimal." (Tr. 876). Exam records from August 2012 document mild midline cervical tenderness, mild lumbar tenderness, and muscle spasms. (*Id.*). Later that month, x-ray results revealed minimal scattered degenerative changes with spur formation in the dorsal spine most prominent at T9-T10. (Tr. 894). In November 2012, Plaintiff reported that she had experienced better pain relief from massage therapy than medication. (Tr. 874). Plaintiff attended physical therapy from February to April 2013. (Tr. 904–27).

In June 2013, Plaintiff increased her fibromyalgia medication. (Tr. 942). In July 2013, Plaintiff reported using her TENS unit daily, which helped reduce her pain but did not allow her to do more or reduce her pain medication. (Tr. 939). In December 2013, she reported neck and back pain with other fibromyalgia symptoms, and was found to have multiple tender trigger points, consistent with fibromyalgia. (Tr. 946).

In March 2014, Plaintiff reported that she had tried to go a month without taking pain medication but felt significantly worse without it. (Tr. 944). She had restarted pain medication

but reported that she only took it when her pain was at its worst. (*Id.*). In July 2015, Plaintiff reported pain and received cortisone injections. (Tr. 952). On August 4, 2015, Plaintiff said that she had not seen a fibromyalgia provider for several years because she believed her pain medications were over-prescribed and that she had poor results with treatment in the past. (Tr. 987). Plaintiff stated that, as a result, she prefers to try to deal with her pain on her own. (*Id.*). At that appointment, she reported that the muscles in her legs and arms hurt and that she often feels fatigued or foggy. (*Id.*). Examination records document widespread muscle tenderness and multiple trigger points. (Tr. 989).

### B. Relevant Hearing Testimony

At the hearing, Plaintiff testified that she currently works as a home health aide. (Tr. 1074). As for the relevant period, Plaintiff testified that she had "chronic pain" and that she had difficulty doing daily activities. (Tr. 1075). She explained that, during that time, she had neck and back pain and fibromyalgia. (*Id.*). When asked what would happen if she was asked to work full time during that period, Plaintiff testified that she would not have been able to sit for extended periods of time and would have had to frequently change positions and lie down. (*Id.*). Plaintiff also reported having "fibro fog," which she described as a lack of focus, memory issues, and tiredness. (Tr. 1076). Plaintiff testified that she still has pain but that it is not as severe. (*Id.*). Also, at the hearing, a vocational expert ("VE") testified that Plaintiff could perform the requirements of a document preparer, address clerk, and surveillance system monitor. (Tr. 1087).

### C. The ALJ's Decision

The ALJ first considered Plaintiff's fibromyalgia. (Tr. 1036). He noted that, in order to find a medically determinable impairment of fibromyalgia, it must have been diagnosed by a licensed physician who reviewed the claimant's medical history and conducted a physical exam;

5

the claimant must show a history of widespread pain in all four quadrants and axial skeletal pain for at least three months, excluding other disorders that could cause the symptoms; and the claimant must show eleven out of eighteen positive tender points on physical exam or repeated manifestation of six or more fibromyalgia symptoms, signs, or co-occurring conditions. (*Id*.). The ALJ found that Plaintiff's fibromyalgia constituted a medically determinable impairment because she "was found to have fifteen of eighteen positive tender points on physical examination" and "was diagnosed by a doctor following a detailed physical examination." (*Id*.).

The ALJ then considered the fact that Plaintiff returned to work in February 2016, "only a few weeks after the last prior unfavorable decision was issued." (Tr. 1041). The ALJ was therefore skeptical of the severity of Plaintiff's symptoms at that time. He explained:

> In February 2016, she testified that her health had deteriorated since she applied for disability. (February 2016 hearing testimony). The Appeals Council makes specific reference to that February 2016 statement in its most recent remand order, directing further consideration of her subjective complaints. (Exhibit 13A). The undersigned finds that the claimant's health was not deteriorating at that point. A few months after making that statement about her health deteriorating, the claimant was actually able to return to work and currently works at substantial gainful activity level at a medium exertional level position. She returned to work in June 2016, only a few weeks after the last prior unfavorable decision was issued. This demonstrated she was either medically improving to allow her to return to work or was never as limited as she alleged in the first place. Either way, it contradicts her claim that her health was declining as of 2016 compared to her prior function reports. The claimant's representative argued that there was medical improvement in 2016 in his request for a closed period of disability. (July 2018 hearing testimony).

(*Id*.).

The ALJ then reviewed Plaintiff's symptoms and treatment history. (Tr. 1043–1049). He concluded that "the objective medical record does not support [her] allegations of disability" and that her "statements about the intensity, persistence, and limiting effects" of her symptoms are "inconsistent." (Tr. 1043).

6

The ALJ then turned to a lengthy review of the objective evidence, including the results of MRIs, X-rays, ultrasounds, and EMGs. (Tr. 1049–1050). He found that "[i]maging did not support [Plaintiff's] allegations." (Tr. 1049).

Next, the ALJ considered the opinion evidence. First, he assessed the 2007 opinions of state agency consultants Dr. Willa Caldwell, Dr. Diane Manos, and Dr. Paul Heban. (Tr. 1051). He assigned their opinions "little weight," explaining that they did not contain "significant details" supporting their findings. (*Id*.). Second, he considered the 2006 opinion of Dr. Todd Finnerty, who opined that Plaintiff has no severe mental impairments. (*Id*.). The ALJ assigned the opinion "great weight," explaining that it was "consistent with the claimant's lack of significant mental health treatment with symptoms relatively controlled with medication." (*Id*.).

Third, the ALJ considered the opinion of Dr. Jonathon Nusbaum, who testified at Plaintiff's 2013 hearing, that Plaintiff had sufficient tender points to be diagnosed with fibromyalgia but believed that, with limitations, she could work full time. (*Id*.). The ALJ afforded this opinion "partial weight," explaining that while it is "generally consistent" with the record, it is "somewhat limited" because Dr. Nusbaum did not examine Plaintiff but rather relied on the record alone. (Tr. 1052).

Fourth, the ALJ considered a number of opinions from chiropractor Walter Baumgartel. (Tr. 1052–53). In October 2006, Mr. Baumgartel opined that Plaintiff could use her extremities for functional tasks but had limitations in sitting and standing for extended periods of time. (Tr. 272.). The ALJ assigned this opinion "little weight," explaining that it is a "general questionnaire completed by a non-acceptable medical source rather than a medical source statement" and further, it "only addressed [Plaintiff's] ability to sit and stand, and even then, vaguely." (Tr. 1052). In November 2007, Mr. Baumgartel opined, in connection with Plaintiff's worker's compensation

7

claim, that Plaintiff's 2006 cervical MRI showed evidence of active degenerative process activated by trauma at the time of her injury and that her accident was a substantial aggravation of her spinal conditions. (Tr. 325). The ALJ assigned this opinion "little weight," explaining that it "provided little information about [Plaintiff's] medical functioning and did not provide a function by function analysis," and moreover, opinions related to worker's compensation claims are not entirely relevant to social security claims. (Tr. 1052). In May 2016, Mr. Baumgartel opined that Plaintiff could work at a sustained basis for zero to three days a week for less than three consecutive weeks per month. (Tr. 1027–28). The ALJ assigned this opinion "minimal weight," explaining that it was "internally inconsistent," that Mr. Baumgartel is not an acceptable medical source, and that his opinion "was contradicted by the medical evidence," including X-rays and the lack of objective evidence. (Tr. 1053).

Fifth, the ALJ considered the opinion of consultative examiner Dr. Phillip Swedberg, who opined in 2007 that Plaintiff could perform at least a moderate amount of sitting, walking, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects. (*Id.*). The ALJ assigned this opinion "partial weight," explaining that it is "somewhat vague," and that Dr. Swedberg saw Plaintiff only once. (*Id.*). Sixth, the ALJ considered the opinion of Dr. Jolie Bitner, who opined in a 2008 letter that, due to her pain, Plaintiff could not return to work. (Tr. 1053–54). The ALJ assigned the opinion "little weight," explaining that it is unsupported and "fairly conclusory." (Tr. 1054).

Seventh, the ALJ considered the opinion of occupational therapist Chris Banks, who found in 2009 that Plaintiff had a number of work-related limitations. (Tr. 1054–55). The ALJ found that "much of Mr. Banks' opinion is not based on an objective review of the medical evidence or is testing of [Plaintiff]" and that "[r]ather, he acted as a scribe repeating [her] own subjective

8

complaints." (Tr. 1055).

Eighth, the ALJ considered the March 2011 opinion of Dr. Stacey Walters, who opined that Plaintiff had a number of work-related limitations. (*Id.*). The ALJ assigned this opinion "little weight," explaining that it "was contradicted by the medical evidence," including X-Rays and lack of objective evidence. (*Id.*).

Finally, the ALJ considered several work excuse notes from the record. (*Id.*). The ALJ assigned these notes "little weight," explaining that they are "conclusory," and "time-limited." (*Id.*).

Based on the above, the ALJ concluded:

> In sum, the above residual functional capacity assessment is supported by the conservative treatment history, the longitudinal medical record, the claimant's statements, and the claimant's presentation on examination. The claimant's allegations are not entirely consistent with the evidence. The claimant's imaging did not support the degree of alleged limitations. While fibromyalgia itself does not have many objective findings, even the subjective complaints she raised to her doctors did not always correspond with her allegations at the various hearings. Despite her years of symptoms, she had a fairly minimal amount treatment records considering the length of time.
> 
> Additionally, she had since returned to work and is currently working at substantial gainful activity at a medium exertion level job. The claimant's representative alleged there has been medical improvement to allow her to return to work. However, there is no such evidence of medical improvement in the record. There is no significant evidence of a sudden change in the claimant's condition, symptoms, or treatment that would explain why she would suddenly be able to return to work. Additionally, the undersigned notes that the claimant once had other benefits cut off after she was seen helping to distribute ice in the community after a power outage. (Exhibit 22F, page 4). The extreme degree of limitations alleged are not supported by the objective medical evidence and are not consistent with her functioning, exam findings, or subjective complaints to her treatment providers. Thus, the claimant's allegations are not entirely consistent with the evidence.
> 
> The claimant's cervical, thoracic, and lumbar degenerative disc disease with radiculopathy, fibromyalgia, and vertebrobasilar insufficiency would thus be expected to limit her to sedentary work with exertional, postural, manipulative, and environmental limitations and limits on use of foot controls. Thus, all evidence has

been considered in assessing the claimant's residual functional capacity.

(Tr. 1055–56).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In her sole assignment of error, Plaintiff asserts that the ALJ erred in assessing her fibromyalgia. (Doc. 11 at 21–26). Specifically, she challenges the ALJ's reliance on objective evidence as well as his credibility findings. (*See generally id.*).

Fibromyalgia is an "elusive" and "mysterious" disease, *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996), which "causes severe musculoskeletal pain [and] is accompanied by stiffness and fatigue due to sleep disturbances." *Preston v. Sec'y of HHS*, 854 F.2d 815, 817 (6th Cir. 1988). "In stark contrast to the unremitting pain of which [fibromyalgia] patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well

as normal muscle strength and neurological reactions." *Id*. at 817–18. Indeed, "[t]here are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in fibrositis patients." *Id*. at 818. The unique nature of fibromyalgia means that ALJs must be careful when considering both objective evidence or the lack thereof as well as the plaintiff's credibility.

**A. Objective Evidence**

First, "[t]he Sixth Circuit and the Social Security Administration have recognized that it makes little sense to rely on a lack of objective medical evidence when addressing both the diagnosis and treatment of fibromyalgia." *Lucas v. Comm'r of Soc. Sec.*, No. 18-10087, 2019 WL 1117927, at *6 (E.D. Mich. Feb. 21, 2019), *report and recommendation adopted*, No. 18-10087, 2019 WL 1112280 (E.D. Mich. Mar. 11, 2019) (citing *Rogers*, 486 F.3d at 243–44 (noting that "opinions that focus upon objective evidence are not particularly relevant" when considering claims involving fibromyalgia)). Consequently, an ALJ errs when he or she discounts a plaintiff's complaints of fibromyalgia symptoms based on a lack of objective evidence and/or benign physical exam findings or test results. *See Shaw v. Comm'r of Soc. Sec.*, No. 1:16-CV-1133, 2018 WL 377383, at *16 (S.D. Ohio Jan. 11, 2018), *report and recommendation adopted*, No. 1:16CV1133, 2018 WL 806286 (S.D. Ohio Feb. 9, 2018) (holding that ALJ erred "[i]nsofar as the ALJ relied on normal physical examination findings to discount plaintiff's subjective complaints related to her fibromyalgia").

Here, when considering the impact of Plaintiff's fibromyalgia, the ALJ improperly relied on Plaintiff's benign imaging and exam results. For example, in concluding that "[i]maging did

not support [Plaintiff]s allegations," (Tr. 1049), he cited normal MRI, X-ray, and EMG results.

(*Id*.). He also discussed Plaintiff's normal physical exam results:

> On November 1, 2007, the claimant had a consultative examination with Dr. Phillip Swedberg.
>
> At that time, the claimant reported having pain from her neck to her low back that occurred following a fall in August 2006. She indicated she had been found to have fibromyalgia. (Exhibit 7F).
>
> On examination with Dr. Swedberg, the claimant had normal strength. She had reduced range of motion in her lumbar spine, but otherwise normal range of motion. She had good grasp, manipulation, pinch, and fine coordination. She had no muscle atrophy or spasms. Her reflexes were intact. She had a normal gait without the use of an assistive device. She was comfortable in the sitting and supine positions. She had a normal mental status and normal intellectual functioning. Her sensation was intact. She could stand on either leg without difficulty. (Exhibit 7F).

(Tr. 1050).

But these considerations are "'simply beyond the point.'" *Lucas*, 2019 WL 1117927, at \*6 (quoting *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861–62 (6th Cir. 2011)). Indeed, "the Sixth Circuit has repeatedly and consistently recognized that fibromyalgia patients typically 'manifest normal muscle strength and neurological reactions and have full range of motion.'" *Turner*, 2014 WL 4930677, at \* 15 (finding that "the fact that [treating physician's] physical examinations of [plaintiff's] extremities and neurological systems yielded normal findings [was] not necessarily inconsistent with fibromyalgia" (quoting *Kalmbach*, 409 F. App'x at 861–62); *see also Lucas*, 2019 WL 1117927, at \*6 (noting that "[t]est results showing normal strength, gait, or range of motion are not convincing evidence of lack of disability" in fibromyalgia cases) (citations omitted). Indeed, on remand in 2017, the Appeals Council instructed the ALJ to reconsider Plaintiff's fibromyalgia, noting that ALJ Wang relied too heavily on a lack of objective evidence given the unique nature of fibromyalgia. (*See* Tr. 1123).

The Commissioner responds that "[o]bjective medical evidence is relevant in assessing the severity and intensity of a claimant's symptoms, even though fibromyalgia is not diagnosed using objective medical evidence." (Doc. 12 at 5). In support, the Commissioner relies on out-of-circuit cases demonstrating that "an objective finding of no muscle wasting can show that it is unlikely that a claimant has extreme pain that sharply limits her physical activity, regardless of what causes the pain." (*Id.* (citing *Stiles v. Astrue*, 256 F. App'x 994, 997 (9th Cir. 2007); *Simila v. Astrue*, 573 F.3d 503, 508 (7th Cir. 2009))). But the problem with this argument is that the ALJ did not rely on objective evidence for these purposes. Rather, he cited objective evidence as proof that Plaintiff's symptoms are not as severe as she claims. As such, these cases are not useful here.

In sum, to the extent that the ALJ relied on normal scans and physical exam findings, the ALJ erred. *See, e.g.*, *Shaw*, 2018 WL 377383, at *16 ("Insofar as the ALJ relied on normal physical examination findings to discount plaintiff's subjective complaints related to her fibromyalgia, the ALJ demonstrated a fundamental misunderstanding of the disease. The ALJ failed to recognize that objective tests and clinical findings are of little relevance in determining the existence or severity of fibromyalgia, which cannot be confirmed by objective findings.").

### B. Credibility Determinations

Next, Plaintiff asserts that the ALJ erred in making credibility determinations regarding Plaintiff's allegations of pain. (Doc. 11 at 23–24).

Because there are not typically objective findings of fibromyalgia, ALJs must make credibility determinations when reaching a decision. *Rogers*, 486 F.3d at 247. These credibility findings must be made "in connection with [the plaintiff's] complaints based on a consideration of the entire case record." *Id.* (quotation marks and citation omitted). "[B]lanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are

not consistent with the entire record and the weight of the relevant evidence." *Id*. at 248. Credibility findings "based solely upon intangible or intuitive notions about an individual's credibility" are also insufficient. *Marks v. Comm'r of Soc. Sec.*, No. 1:16-CV-02848, 2018 WL 1801609, at *13 (N.D. Ohio Jan. 12, 2018), *report and recommendation adopted sub nom. Marks v. Comm'r of Soc. Sec. Admin.*, No. 1:16CV2848, 2018 WL 739100 (N.D. Ohio Feb. 7, 2018) (citing *Rogers*, 486 F.3d at 247–248). Instead, the ALJ must make credibility determinations supported by a consideration of the entire record. *Id*.

Specifically, the ALJ should "consider a number of factors that may or may not corroborate the claimant's allegations of pain, including: statements from the claimant and the claimant's treating, examining, or consulting physicians; the claimant's daily activities; the location, duration, frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate symptoms; treatment, other than medication, the claimant receives to relieve pain; measures used by the claimant to relieve symptoms; and any other factors concerning functional limitations due to symptoms." *Id*. (citations omitted). In sum, "the ALJ's credibility determinations 'must be sufficiently specific to make clear to the individual to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Id*. (quoting *Rogers*, 486 F.3d at 248).

At bottom, "subjective pain complaints play an important role in the diagnosis and treatment of [fibromyalgia]," and consequently, it is "particularly important" that an ALJ justify his or her reasons when discounting a claimant's statements. *Id*. (citation omitted).

Here, when discounting Plaintiff's credibility, the ALJ made 4 findings: (1) that Plaintiff's subjective complaints did not reflect her testimony; (2) that Plaintiff had minimal treatment records for fibromyalgia; (3) that Plaintiff returned to work in 2016, shortly after the most recent

unfavorable ALJ decision; and (4) that Plaintiff had once had her benefits terminated after she was seen distributing ice to her community after a power outage. (Tr. 1055–56).

First, the ALJ considered the credibility of Plaintiff's subjective complaints, finding that, "[w]hile fibromyalgia itself does not have many objective findings, even the subjective complaints she raised to her doctors did not always correspond with her allegations at the various hearings." (Tr. 1056). The ALJ, however, does not elaborate on this conclusion or provide examples from the medical record or hearing testimony to support this conclusion. Similarly, prior to summarizing the record, the ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were "inconsistent." (Tr. 1043). But in summarizing the medical evidence, the ALJ did not cite examples of such inconsistencies. (*See* Tr. 1043–1047). It appears therefore that the ALJs conclusion that Plaintiff's subjective assertions of pain are "inconsistent" is merely a "[b]lanket assertion that [she] is not believable." *Rogers*, 486 F.3d at 248. The law requires more, especially in fibromyalgia cases.

Second, the ALJ discounted the credibility of Plaintiff's subjective complaints of pain due to the "fairly minimal amount [of] treatment records," (Tr. 1056), and the fact that in 2015, Plaintiff told her doctor that she preferred to handle her fibromyalgia pain on her own, (Tr. 1048). But ALJs are not permitted to "draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Davis v. Colvin*, No. 1:14-CV-293, 2015 WL 5139082, at *6 (S.D. Ohio Sept. 2, 2015) (quotation marks and citation omitted) (finding that "the ALJ did not give [plaintiff] an opportunity to explain why she did not follow through with exercise programs or why there are gaps in her treatment

15

records concerning her fibromyalgia"). Here, however, the ALJ did not elaborate on the lack of treatment records or any gaps in Plaintiff's treatment history. Rather, he cursorily asserted that "[d]espite her years of symptoms, she had a fairly minimal amount [of] treatment records considering the length of time." (Tr. 1056). This statement, without more, is not enough to support a credibility finding. *See Davis*, 2015 WL 5139082, at *6.

Third, the ALJ discounted Plaintiff's credibility because she returned to work in 2016 shortly after an unfavorable decision:

> In February 2016, she testified that her health had deteriorated since she applied for disability. . . . The undersigned finds that the claimant's health was not deteriorating at that point. A few months after making that statement about her health deteriorating, the claimant was actually able to return to work and currently works at substantial gainful activity level at a medium exertional level position. She returned to work in June 2016, only a few weeks after the last prior unfavorable decision was issued. This demonstrated she was either medically improving to allow her to return to work or was never as limited as she alleged in the first place. Either way, it contradicts her claim that her health was declining as of 2016 compared to her prior function reports.
>
> * * *
>
> . . . The claimant's representative alleged that there has been medical improvement to allow her to return to work. However, there is no such evidence of her medical improvement in the record. There is no significant evidence of a sudden change in the claimant's condition, symptoms, or treatment that would explain why she would suddenly be able to return to work.

(Tr. 1041, 1056). The Court notes that it was not unreasonable for the ALJ to consider the fact that Plaintiff returned to work shortly after complaining of severe pain. But this consideration is potentially relevant only to the latter portion of the closed period at issue in this case. Consequently, the fact that Plaintiff returned to work in 2016 does not justify the ALJ's wholesale credibility finding regarding Plaintiff's complaints of pain.

Finally, the ALJ considered the fact that Plaintiff had another form of "financial assistance" suspended in 2012 after she was seen helping distribute ice during a power outage over the

summer. (Tr. 1047, 1056). Again, however, while the ALJ was well within his discretion to consider this evidence, a single instance in 2012 does not justify undermining Plaintiff's myriad complaints of pain related to her fibromyalgia.

Moreover, it is important to note what is absent from the ALJ's credibility analysis. The ALJ does not specifically discuss "factors that may or may not corroborate [her] allegations of pain," including the consistency of medical opinions with Plaintiff's statements and the medical record, the frequency and intensity of her symptoms, precipitating and aggravating factors, the type, dosage, effectiveness and side effects of her medications, or measures she used to relieve her symptoms. *Marks*, 2018 WL 1801609, at *12. *See, e.g.*, *Anderson v. Comm'r of Soc. Sec.*, No. 2:18-12008, 2019 WL 3943973, at *14 (E.D. Mich. July 31, 2019), *report and recommendation adopted*, No. 18-12008, 2019 WL 3936651 (E.D. Mich. Aug. 20, 2019) (remanding where ALJ failed to provide sufficient justification for discounting claimant's subjective pain complaints); *Shaw*, 2018 WL 377383, at *16 (remanding where ALJ's credibility assessment was "not supported by substantial evidence because the ALJ gave no indication that he factored into the credibility analysis relevant considerations including plaintiff's daily activities and factors that precipitate and aggravate her pain and symptoms"); *Davila v. Comm'r of Soc. Sec.*, 993 F. Supp. 2d 737, 759 (N.D. Ohio 2014) (remanding where "ALJ made no further reference to [the plaintiff's] daily activities, the location, duration, frequency, and intensity of Plaintiff's symptoms, factors that precipitated or aggravated [her] symptoms, or any other factors bearing on [her] limitations to perform basic functions").

At base, the ALJ made only passing statements regarding Plaintiff's credibility and did not support his conclusion with examples from the record or rely on other relevant factors. Consequently, his credibility findings were not "sufficiently specific to make clear to the

individual to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Marks*, 2018 WL 1801609, at *12. As such, remand is warranted.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge under Sentence Four of § 405(g).

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: October 17, 2019         /s/ Kimberly A. Jolson
                               KIMBERLY A. JOLSON
                               UNITED STATES MAGISTRATE JUDGE